**JAPAN LINES (USA) LTD., a corporation, Plaintiff,**

v.

**WESTERN STEVEDORING AND TERMINAL CORPORATION, a corporation, Defendant.**

**Civ. No. C74–587.**

United States District Court,
D. Oregon.
June 9, 1975.

Paul N. Wonacott, of Wood, Wood, Tatum, Mosser & Brooke, Portland, Ore., for plaintiff.

William F. White, of White, Sutherland, Parks & Allen, Portland, Ore., for defendant.

## OPINION

BEEKS,[*] Senior District Judge:

On April 29, 1974, the M/S GOLDEN ARROW; owned by plaintiff, was berthed at the No. 2 loading dock, Port of Portland, Portland, Oregon. There, by use of an Hitachi 371 crane owned by the Port of Portland ("Port") and operated by defendant Western Stevedoring

and Terminal Corporation ("Western"), empty container vans were discharged from the GOLDEN ARROW and full container vans were loaded thereon. Port having undertaken to provide stevedoring services to the vessel, Western was performing its services for and on behalf of the Port. During the course of the cargo handling operation, a loaded container (designated SCIU 211625) fell from the boom of the crane into Bay 14 of the GOLDEN ARROW. The vessel, the container and the crane sustained damage. Plaintiff seeks to recover for damage to the vessel and the container; defendant counterclaims for damage to the crane.

Plaintiff propounds a theory of negligent operation of the crane, and seeks to invoke the evidentiary assistance of inferences available under the doctrine of *res ipsa loquitur*. Western denies negligence, challenges the propriety of *res ipsa loquitur,* and, by its counterclaim, alleges that the accident was the proximate result of the unseaworthy condition of the vessel. Explication of the legal issues is facilitated by a brief discussion of the facts surrounding the casualty.

Emil Mussman, operator of the crane on the day of the accident, had 15 years of experience as a crane operator and had served as an instructor in crane operation. He had extensive experience with the Hitachi 371 crane. On the day in question, Mussman reported to work and conducted an inspection of the crane before commencing handling of the GOLDEN ARROW's cargo. Mussman found the crane to be in good operating order.

The crane is specially fitted for the handling of container vans. The falls from the boom are attached to a rectangular spreader beam of roughly the same dimensions as the upper surface of the standard size container van. Each of the four corners of the spreader beam is equipped with a bayonet-like fixture

[*] The Honorable William T. Beeks, Senior United States District Judge for the Western District of Washington.

known as a twistlock. The twistlocks protrude downward from the corners of the spreader beam, and, as the spreader beam is lowered into place over a container van, the twistlocks insert into corresponding female fittings on each corner of the container. When the twistlocks are thus properly in place, the crane operator turns an ignition switch-type key, and the twistlocks rotate 90 degrees within the female fittings, locking the spreader beam to the van. When locking occurs, a red light appears on a console in the cab of the crane, and is visible to the crane operator. Only when the spreader beam is locked to the container can the container be raised.

An additional feature of the containerized cargo handling operation is that the cargo holds of vessels designed for carrying container vans are fitted with vertical angle irons known as cell guides. As a container is brought over the hatch preparatory to lowering, it must be positioned so that the four corners of the van are aligned with the cell guides. As the van is then lowered into the hold, the cell guides maintain its position and alignment. Uniform distribution, stacking and securing of containers within the hold is thus achieved.

Mussman began his work at Bay 14 of the GOLDEN ARROW by off-loading two empty containers. The discharge of the two container vans was accomplished without difficulty, although Mussman noticed a slight drag as each container was raised along the cell guides of the bay. Mussman did not cease operations, or otherwise call anyone's attention to the drag that he felt because he did not consider it to be significant.

The two empty vans having been discharged, Mussman proceeded with the stowage of loaded container van SCIU 211625. The van was brought into position on the loading platform, and the spreader beam coupled thereto. Mussman activated the locking switch, observed that the red light was on, and hoisted the van from the pier and into position over Bay 14. He then aligned the container with the cell guides, and put the crane controls into the full "lower" position. The container was thus lowered quickly to a point at which it stopped prematurely, apparently being hung up within the cell guides. The crane continued to release cable, creating slack above the container. Mussman's first action upon seeing the container hang up was to reverse the controls to retrieve the slack. Before he was able to do so, however, the container came loose, fell to the end of the slack cable (creating a tremendous jolt to the crane), broke free, and fell to the bottom of the hold, damaging the deck, the container and the crane.

Examination of the spreader beam and the container after the accident revealed that the twistlocks on the two after corners of the spreader beam had torn loose, causing extensive damage to the twistlocks and to the after female fittings on the container. The two forward twistlocks, however, had apparently released cleanly. An inspection also revealed that the crane and its electrical system were in good working order after the accident.

Plaintiff alleges that Mussman was negligent in failing to halt operations after the difficulty encountered in discharging the two empty vans, and in releasing the locking switch while van SCIU 211625 was still aloft.

██ With regard to the first allegation, Mussman testified that the drag or hitch that he felt was very slight and did not cause the crane to "groan" as under excess strain. He further testified that a slight drag such as was encountered is not unusual, and is generally attributable to imprecise alignment of the container within the cell guides. Mussman also testified that he does not hesitate to halt loading operations to investigate a problem when he believes one to exist. His impressive safety record over the years lends weight to his testimony. On the basis of the evidence before me, I am not prepared to find Mussman at fault for continuing opera-

tions after noticing the slight drag that his experience taught him did not indicate a significant problem or hazard.

Plaintiff's second allegation of negligence is that Mussman turned the locking switch to the "off" position while van SCIU 211625 was still in the air. This contention is based upon the testimony of Bob Jones, equipment superintendant for the Port, that the forward twistlocks could not have released prior to the fall of the container unless the lock was in the "off" position. In Jones' opinion, the fact that the forward twistlocks had freed cleanly, rather than tearing loose, indicates that the locking switch must have been in the "off" position. He testified that although the locking switch must be activated before a container can be lifted, if it is thereafter switched off, the twistlocks will remain locked so long as they bear the weight of the load. If the switch is "off," however, and the twistlocks cease to bear the load, they can and will release. Jones described an unauthorized procedure known as "highballing" whereby the crane operator will pick up a container, then turn the locking switch to "off," so that when the container is set down in the hold or on the pier the twistlocks will automatically release, thus saving a few seconds during each movement.

Plaintiff contends that Jones' testimony suggests the inference that Mussman was operating the crane at the time of the accident with the locking switch in the "off" position, and that when the container hung up in the cell guides the weight of the load was removed from the twistlocks, allowing the forward locks to release, thus precipitating the fall of the van once it dislodged itself from the cell guides.

Mussman, however, testified that highballing is unauthorized and unsafe, and that he never engaged in such a practice. He further testified that the locking switch and the corresponding red light remained on throughout the handling of van SCIU 211625. I believe

him. Nonetheless I also accept as accurate Jones' testimony that the twistlocks will not release, as the two forward twistlocks apparently did here, unless the switch has been turned off.

Despite their divergent testimony, I have no reason to doubt the credibility of either Mussman or Jones, and I believe that both have testified truthfully to the best of their ability. In view of such conflicting testimony, plaintiff has not persuaded me as to the cause of the release of the forward twistlocks. Either one of the witnesses is mistaken, or there was a different cause, unknown to the parties or not brought to the attention of the Court.

Moreover, I do not accept plaintiff's theory that the release of the forward twistlocks is the proximate cause of the casualty. The elements of the casualty are (1) the hanging up of the van within the cell guides, leading to (2) the accumulation of slack in the cable, (3) the fall of the van to the end of the slack, and (4) the breaking free of the container from the spreader beam, and its fall into the hold. In my view the hanging up of the van in the cell guides was as causative of the casualty as the release at some point in time of the forward twistlocks. After first hanging up, and then falling to the end of the accumulated slack, the van tore free from the after twistlocks: had not the forward twistlocks released cleanly, they might well have been torn asunder, as were the after locks, by the full weight of the loaded container falling to the end of the slackened cable. Moreover, assuming the twistlocks could not have released while bearing the weight of the load, it was the hanging up of the van in the cell guides that unburdened the twistlocks and made possible the release of the forward pair. Accordingly, whatever caused the container to lodge within the cell guides might well have been the proximate cause of the accident. Plaintiff does not contend that negligence of Mussman or Western caused the container to hang up in the

cell guides, and none of the evidence adduced at trial would lend support to such a contention.

■■ Consequently, I am unable to find by a preponderance of the evidence before me that negligence of Western was a proximate cause of the accident. Plaintiff, however, seeks to avoid the dismissal that would normally follow its failure to sustain its burden of proof as to causation by invoking the doctrine of *res ipsa loquitur*. Under that doctrine there is available to plaintiff a permissible inference of defendant's negligence if (1) the accident probably would not have occurred in the absence of negligence, (2) the instrumentality causing the injury was, at the time of the accident, under the exclusive control of the defendant and (3) plaintiff's conduct does not impair the inference of negligence in any way.[1]

The first criterion is fairly met in this case. But for negligence of some sort, container vans do not normally free-fall into the holds of cargo vessels.[2]

The second criterion, however, is not met in this case. Western did not have exclusive control of all instrumentalities affecting stowage of container van SCIU 211625 in the hold of the GOLDEN ARROW. Certainly the crane was in the exclusive control of Western through its employee Mussman, and it may be conceded (although it is not alleged) that improper alignment by Mussman of the container within the cell guides might have caused the container to lodge therein. There are, however, other possible agencies that might have achieved the same result.

First, there could have been some irregularity or distortion of the cell guides. The cell guides, as fixtures of the vessel, were within the control of plaintiff, and there was no testimony tending to show that the guides were inspected or otherwise found to be in proper condition prior to the accident.

Second, free movement of a container within the cell guides might have been impeded by improper fore and aft or athwartships trim of the vessel. Since the container, by virtue of gravitational force, will descend vertically, any deviation from the vertical in the cell guides, such as would be found in a listing vessel, might sufficiently impair the vertical movement of the container as to cause it to hang up within the guides. Proper trim of the GOLDEN ARROW here was within the control of the plaintiff, yet no testimony was brought to bear on this factor.

A third possible cause of the hanging up would be an irregularity on one or more of the corner surfaces of the container. Again, this is a factor within the control of plaintiff, and again, no testimony was introduced with regard to this potential factor.

■■ There are thus present multiple instrumentalities, any one of which, alone or in combination with others, might have brought about the accident. Plaintiff failed to come forward with evidence tending to eliminate as possible causes any of the factors within its control. The failure to negate its own potential responsibility deprives plaintiff of the benefit of any *res ipsa loquitur* inference. As phrased by Judge Fee of this Court,

"... where good sense, based upon the crystallized experience of man, cannot fix the responsibility upon the person against whom negligence is to be inferred by reason of circumstances which irrefutably point the finger of liability, the presumption will not arise."[3]

Insofar as it cannot be said that the instrumentality by which the accident was

---

1. *Furness, Withy & Co., Ltd. v. Carter*, 281 F.2d 264 (9th Cir. 1960). *See also A.L.I., Restatement of the Law of Torts 2d*, § 328D.

2. *Cf., Johnson v. United States*, 333 U.S. 46, 68 S.Ct. 391, 92 L.Ed. 468 (1948).

3. *The Mercier*, 5 F.Supp. 511, 512 (D.Or. 1933).

caused was within the exclusive control of the defendant, I hold that *res ipsa loquitur* is inapplicable to this case.[4]

Plaintiff having failed to establish the negligence of Western, and the doctrine of *res ipsa loquitur* not being available, the complaint must be dismissed.

■ Defendant having failed to establish that the accident was caused by unseaworthiness of the GOLDEN ARROW, the counterclaim must likewise be dismissed. Each party to bear its own costs.

The foregoing shall constitute my findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a). The Clerk will enter judgment in accordance herewith.

---

4. Western contends that *res ipsa loquitur* is inapplicable to this case for the additional reason that plaintiff has alleged only specific acts of negligence. *Res ipsa loquitur*, it is argued, may be invoked only in aid of a general allegation of negligence. This argument finds support in *Furness, Withy & Co., Ltd.* v. *Carter, supra* note 1. *Olsen v. States Line*, 378 F.2d 217 (9th Cir. 1967), in which there was an allegation of general negligence, is not to the contrary. Having found *res ipsa loquitur* to be otherwise inapplicable, however, it is not necessary to reach this issue.